UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

JOHN HOOPER,                                                    COMPLAINT AND JURY
                          PLAINTIFFS                    DEMAND
      -against-

THE CITY OF NEW YORK, DETECTIVE GREGORY
JEANBAPTISTE, Shield No. 6454; SERGEANT
EDWARD BABINGTON; JOHN DOE # 1-4
                          DEFENDANTS
------------------------------------------------------------------------ x

Plaintiff JOHN HOOPER, by his attorneys, Stoll, Glickman & Bellina, LLP, for his complaint allege as follows:

PRELIMINARY STATEMENT

1. This is a civil rights action in which plaintiff seeks relief through 42 U.S.C. §1983 for the violation of his Fourth and Fourteenth Amendment rights.

2. The claim arises from a July 16, 2012 incident in which Officers of the New York City Police Department ("NYPD"), acting under color of state law, intentionally and willfully subjected plaintiff to false arrest and malicious prosecution.

3. Plaintiff seeks monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

JURISDICTION

4. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §1983 and §1988 and the laws and Constitution of the State of New York.

5. The jurisdiction of this court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4),

1367(a) and the doctrine of pendent jurisdiction.

## VENUE

6. Venue is laid within the Eastern District of New York in that Defendant City of New York is located within and a substantial part of the events giving rise to the claim occurred within the boundaries of the Eastern District.

## PARTIES

7. Plaintiff John Hooper is a resident of Kings County in New York State.

8. The City of New York (or "the City") is a municipal corporation organized under the laws of the State of New York. At all times relevant hereto, Defendant City, acting through the New York Police Department (or "NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel. In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

9. Detective Gregory Jean-Baptiste, Shield No. 6454, and Sergeant Edward Babington, were at all times here relevant, police officers of the NYPD, and as such were acting in the capacity of an agent, servant and employee of the City of New York. On information and belief, the above named individual defendants were involved in the illegal arrest of plaintiff and/or failed to intervene in the actions of their fellow officers. The defendant police officers are sued in their individual capacity.

10. All other individual defendants including John Doe #1-4, individuals whose names are currently unknown to plaintiff, are employees of the NYPD, and are sued in their individual

capacities.

11. At all times here mentioned defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## FACTUAL ALLEGATIONS

12. On July 16, 2012 at approximately 8:00 pm, plaintiff John Hooper was near the intersection of Rutland Road and 92nd Street in Brooklyn New York.

13. At that time, and continuing to present, Plaintiff lived a short distance from that area.

14. Plaintiff deposited a garbage bag near a trash receptacle at the corner.

15. Plaintiff then began walking away from the trash receptacle.

16. Defendant Jean-Baptiste approached plaintiff, ordered him to put his hands behind his back, and placed him under arrest.

17. Defendant Babington was also present for the arrest of plaintiff.

18. Plaintiff was not immediately informed why he was being arrested.

19. Plaintiff later learned that the officers claimed to have witnessed the plaintiff deposit a firearm in the trash receptacle.

20. At no time did plaintiff possess a firearm on July 16, 2012, nor was it reasonable for the officers to believe he had done so.

21. Plaintiff was charged with criminal possession of a weapon in the second and fourth degree.

22. Defendants conveyed false allegations about the defendant's possession of a weapon to members of the District Attorney's Office, and swore to those false allegations in criminal court documents.

23. As result of said false, sworn allegations, plaintiff was arraigned in Kings County Criminal Court.

24. Plaintiff was assigned bail and held in the custody of the City of New York at the detention complex located at Riker's Island.

25. Upon information and belief, no fingerprint, DNA, or other forensic evidence linked plaintiff to the supposed gun.

26. On January 11, 2013 plaintiff passed a polygraph examination in which he denied possessing a firearm on July 16, 2012.

27. On May 1, 2013 a suppression hearing regarding plaintiff's criminal charges was held before the Hon. Guy J. Mangano.

28. Defendant Jean-Baptiste testified at the suppression hearing.

29. At the conclusion of testimony Judge Mangano stated that he found Defendant Jean-Baptiste's testimony regarding the circumstances of the supposed discovery of evidence to be "incredible." Judge Mangano reserved decision on the suppression issue until the following day.

30. When plaintiff returned to court on May 2, 2013, the District Attorney's Office offered a plea agreement with an agreed upon sentence of one year. Judge Mangano explained on the record that based on the amount of jail time the plaintiff had accumulated, he would be released that day if he accepted the plea offer.

31. Plaintiff agreed to plead guilty and be immediately released rather than risk going forward with his motion to suppress.

32. Plaintiff was thereafter sentenced and released on May 2, 2013.

33. In total plaintiff was incarcerated from July 16, 2012 through May 2, 2013.

34. Following the plaintiff's plea, additional information came to light about the defendant

officers and the circumstances of their supposed discovery of evidence in plaintiff's case.

35. During late 2013 defense attorneys at the Legal Aid Society and Brooklyn Defender services began to notice stunning similarities between the supposed discoveries of guns by defendants Jean-Baptiste, Babington, and other officers in their unit.

36. In spring of 2015 the plaintiff's criminal defense attorney began working with the King's County District Attorney's Office to obtain their consent to the withdrawal of plaintiff's plea of guilty based on the new evidence calling into doubt the defendant officers' account of events.

37. On June 26, 2015, plaintiff again appeared before Judge Mangano in Kings County Supreme Court. On the motion of defense counsel, and with consent Kings County District Attorney's Office, Judge Mangano vacated plaintiff's plea of guilt and dismissed all charges against plaintiff.

38. A pattern has been discovered in a number of gun arrests made be defendant officers, which significantly calls into doubt their testimony in plaintiff's case as well as others.

39. In many of cases of alleged firearm recovery by the defendants' police unit, officers alleged to have received a tip from a confidential informant regarding possession of a firearm. However, these confidential informants were rarely produced in court and a large number of those charges were dismissed or resolved by plea agreements to significantly lowered charges as a result of the informants not being produced.

40. The criminal defense attorneys investigating these officers have suggested that the officers were abusing a program known as Operation Gun Stop. Operation Gun Stop is an NYPD program wherein persons who provide information that leads to the recovery of illegal firearms receive a $1000 reward. Based on the investigation into the plaintiff's case and those

like him, the defense attorneys raised questions regarding whether the defendant officers were purporting to pay reward money to confidential informants who never actually existed and keeping the money for themselves.

41.  Upon information and belief, the defendant officers are currently under investigation by the Kings County District Attorney's Office and/or the NYPD Internal Affairs Bureau in relation to this pattern of cases.

42.  As the defendant officer's credibility came into question, a number of cases of alleged firearm possession were dismissed.

43.  A man with the initials E.M. was arrested for possession of a firearm by defendant Jean-Baptiste and others.  The circumstances of his arrest were very similar to those of plaintiff's arrest.  In October of 2013 the Hon. William Harrington of the Kings County Supreme Court found defendant Jean-Baptiste's testimony to lack credibility, suppressed the supposed evidence against E.M., and subsequently dismissed the charges against him.

44.  A man with the initials J.H. was arrested for possession of a firearm by defendants Jean-Baptiste and Babington, among others, on June 4, 2013.  The circumstances of his arrest were very similar to those of plaintiff's arrest.  Criminal charges against J.H. were dismissed on January 15, 2015 when the King's County District Attorney's Office admitted it could not prove its case beyond a reasonable doubt.  J.H. currently has a civil lawsuit for false arrest among other claims pending in the Federal District Court for the Eastern District of New York.

45.  A man with the initials T.C. was arrested for possession of a firearm by defendant Babington, among others in 2007.  The circumstances of his arrest were very similar to those of plaintiff's arrest.  T.C. was prosecuted in Federal District Court for the Eastern District of New York.  Following a suppression hearing, the Hon. Dora L. Irizarry, said the officers' testimony

"was just incredible, and I say 'incredible' as a matter of law." She went on to say: "I believe these officers perjured themselves," Judge Irizarry added. "In my view, there is a serious possibility that some evidence was fabricated by these officers." Criminal charges against T.C. were dismissed on January 8, 2010. T.C. later filed a civil lawsuit for false arrest in the same court, which was resolved by a settlement in the amount of $115,000.

46. Upon information and belief, the defendant police officers have been found incredible in a number of criminal cases by various judges of the New York State court system.

47. Upon information and belief, the defendant police officers have repeatedly relied on the testimony of supposed confidential informants whom the District Attorney's Office was later unwilling or unable to produce in court, often even after Criminal Court Judges ordered their production.

48. Defendants lacked probable cause or reasonable suspicion to believe plaintiff had been involved in any illegal activity.

49. Nevertheless defendants brought falsified charges against plaintiff, and fabricated evidence against him.

50. At all times during the events described above, the defendant police officers were engaged in a joint venture and formed an agreement to violate plaintiff's rights. The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events. They failed to intervene in the obviously illegal actions of their fellow officers against plaintiff.

51. During all of the events above described, defendants acted maliciously and with intent to injure plaintiff.

## DAMAGES

52. As a direct and proximate result of the acts of defendants, plaintiff suffered the following injuries and damages:

    a. Violation of his rights pursuant to the Fourth and Fourteenth Amendments to the United States Constitution;

    b. Violation of his rights to Due Process of Law under the Fourteenth Amendments to the United Stated Constitution;

    c. Loss of liberty;

    d. Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, anxiety;

    e. Economic loss.

## FIRST CAUSE OF ACTION
(42 U.S.C. § 1983 – as to Individual Defendants)

53. The above paragraphs are here incorporated by reference.

54. Defendants have deprived plaintiff of his civil, constitutional and statutory rights under color of law and have conspired to deprive him of such rights and are liable to plaintiff under 42 USC § 1983.

55. Defendants' conduct deprived plaintiff of his right to be free of unreasonable searches and seizures, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution. Defendants' conduct also deprived plaintiff of his right to due process of law, pursuant to the Fourteenth Amendment of the United States Constitution.

56. Defendants falsely arrested plaintiff, maliciously prosecuted him, and failed to intervene in each other's obviously illegal actions.

57. Plaintiff has been damaged as a result of defendants' wrongful acts.

## SECOND CAUSE OF ACTION
(42 U.S.C. § 1983 – Municipal And Supervisory Liability as to Defendant City of New York)

58. The above paragraphs are here incorporated by reference.

59. The City is liable for the damages suffered by plaintiff as a result of the conduct of their employees, agents, and servants, in that, after learning of their employees' violation of plaintiff's constitutional rights, they failed to remedy the wrong; they have created a policy or custom under which unconstitutional practices occurred and allowed such policies or customs to continue, and they have been grossly negligent in managing subordinates who caused the unlawful condition or event. The City has been alerted to the regular occurrence of false arrests by its police officers, but has nevertheless exhibited deliberate indifference to such false arrests; that deliberate indifference caused the violation of plaintiff's constitutional rights in this case.

60. As explained above, the officers in this case have engaged in a pattern of falsifying evidence of the recovery of firearms, quite likely in order to enrich themselves through the abuse of Operation Gun Stop. The City of New York has failed to install adequate supervision to monitor its officers and ensure that they are following the law. The City has failed to take adequate remedial steps after its officers are found to lack credibility by Judges of the New York Criminal Court. The City has failed to adequately monitor the use of confidential informants and has thereby allowed its officers to fabricate evidence without consequences.

61. In the name of confidentiality, the City has allowed police officers including defendants to maintain informants behind a veil of secrecy, without adequate supervision to ensure officers honestly report the information provided by informants.

62. The City was aware, or should have been aware that defendant Jean-Baptiste and/or Babington had testified falsely in several judicial proceedings prior to plaintiff's arrest. However the City has repeatedly refused to impose any consequences on police officers after judicial

findings that the officers lack credibility. The City has permitted and condoned the regular dishonesty of its officers in judicial proceedings under oath. That lack of response has caused officers to lie under oath without fear of repercussions.

63. The City was aware, or should have been aware that defendant Jean-Baptiste and/or Babington have been the subject of multiple lawsuits alleging police misconduct. And while the City has allocated funds to settle these lawsuits for money damages, it has repeatedly failed to discipline the officers, or hold them accountable for the violations of the rights of civilians.

64. The City's continuing failure to deter police misconduct has led to ever increasing numbers of lawsuits for repeat routine misconduct by the same officers, same units and same precincts. In 2012, New York City paid out over $131 million for the fiscal year, compared to 2011, when it paid out more than $166 million, and 2010, when it paid $128 million.[1] In the past ten years, the City of New York has paid nearly a billion dollars on lawsuits brought against the NYPD.[2] More than 40% of those settlements in 2011 stem from excessive force and false arrest.

65. The widely held assumption is that civil rights lawsuits deter police misconduct. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails. Wyatt v. Cole, 504 U.S. 158, 161, (1992) citing Carey v. Piphus, 435 U.S. 247, 254-257, (1978). "As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts." See Hudson v. Michigan 547 U.S. 586, 598 (2006) citing Correctional Services Corp. v. Malesko, 534 U.S. 61, 70 (2001) and Nix v. Williams, 467

---

[1] Mayor Michael Bloomberg's preliminary Management Report for FY 2013, available at http://www.nyc.gov/html/ops/downloads/pdf/pmmr2013/2013_pmmr.pdf, see page 6, last visited on June 25, 2013.

[2] "NYPD Has Paid Out Nearly $1 Billion in Claims Over Past Decade," by Associated Press Writers Colleen Long and Jennifer Peltz, http://www.law.com/jsp/article.jsp?id=1202473432953, October 15, 2010 last visited on June 25, 2013.

U.S. 431, 446, (1984). "It is almost axiomatic that the threat of damages has a deterrent effect (citation omitted) surely particularly so when the individual official faces personal financial liability." Carlson v. Green, 446 U.S. 14, 21, (1980), citing Imbler v. Pachtman, 424 U.S. 409, 442, and footnote 6 (1976).

66.  However, the City of New York has isolated NYPD officers from accountability for its civil rights lawsuits by indemnifying officers who violate the constitutional rights of citizens, and, as a result, is preventing civil rights lawsuits from having any deterrent value to the City, the NYPD or its officers. Civil rights lawsuits against police officers have no impact on the officers' careers, regardless of the expense to the City of the officers' lawsuit liability, even after multiple lawsuits.  In 1999, former Comptroller Alan Hevesi reported that there was a "a total disconnect" between the settlements of even substantial civil claims and police department action against officers.  This "total disconnect" between officers' liability and NYPD discipline, results in a system where the City pays vast sums to settle false arrests, but the NYPD does nothing to investigate nor address the underlying causes of such false arrests or officers who have incurred large sums of civil rights liability. The City Council, Government Operations Committee, despite being alerted at a City Council hearing on December 12, 2009, and on other occasions, to the obvious problem of officers and precincts with a disproportionate responsibility for civil rights lawsuit liability, has failed to take action to hold officers or precincts accountable. It has likewise failed to hold an investigative hearing into what extent specific officers, units and precincts are disproportionately responsible for New York City civil rights lawsuits.

67. The City is liable for the damages suffered by plaintiffs in that, after learning of their employees' violation of plaintiffs' constitutional rights, they failed to remedy the wrong; they have created a policy or custom under which unconstitutional practices occurred and allowed

such policies or customs to continue, and they have been grossly negligent in managing subordinates who caused the unlawful condition or event.

68. The aforesaid event underlying plaintiffs' factual allegations was not an isolated incident. The City has been aware for some time, from lawsuits, notices of claim, complaints filed with the Civilian Complaint Review Board, and judicial rulings suppressing evidence and finding officers incredible as a matter of law, that a disturbing number of their police officers unlawfully search and seize citizens, bring charges against citizens with no legal basis, perjure themselves in charging instruments and testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers. Nevertheless, the City has allowed policies and practices that allow the aforementioned to persist.

69. The City has been alerted to the regular use of false arrests by its police officers, through lawsuits, civilian complaints, notices of claim, City Council hearings, newspaper reports, and cases resulting in declined prosecutions and dismissals, but has nevertheless exhibited deliberate indifference to such false arrests; that deliberate indifference caused the violation of plaintiff's constitutional rights in this case.

70. Nevertheless, the City has repeatedly resisted attempts to catalog even basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and discipline in the NYPD. The City's deliberate indifference towards the contents of civil rights litigation, towards individual officers repeatedly named in lawsuits, towards incidents repeatedly occurring in the same precinct, towards patterns of misconduct that arise in civil rights litigation has caused the constitutional violations against plaintiff.

71. Additionally, according to a report of the New York City Bar Association issued in 2000, the City has isolated its law department from the discipline of police officers. Civil rights

lawsuits against police officers have no impact on the officers' careers, regardless of the officers' responsibility lawsuit liability, even after multiple lawsuits. Alan Hevesi, as New York City Comptroller, in 1999 reported that there was a "a total disconnect" between the settlements of even substantial civil claims and police department action against officers. Nothing has changed since 1999 and the present regarding this "total disconnect" between officers' liability and NYPD discipline, resulting in a system where the City pays vast sums to settle false arrests, but the NYPD does nothing to investigate nor address the underlying causes of such false arrests.

72. The City has also been alerted to the regular use of stop and frisks by its police officers, which disproportionately target people of color, despite the lack criminal evidence that such stop and frisks actually produce, and despite the humiliation, inconvenience and constitutional violations that the majority of law-abiding people, mostly in communities of color, suffer as a result. In 2008, of the 531,159 New Yorkers were stopped by the police, 465,413 were totally innocent (88 percent). From the total, 271,602 were black (51 percent); 167,111 were Latino (32 percent); and 57,407 were white (11 percent). In 2007, of the 468,732 New Yorkers were stopped by the police, 407,923 were totally innocent (87 percent). From the total in 2007, 242,373 were black (52 percent), 142,903 were Latino (31 percent), 52,715 were white (11 percent).[3]

73. The City is also aware that the misconduct does not stop at the regular use of stop and frisks to violate the civil rights of innocent people. In 2008, more than half (51%) of the summonses issued by NYPD officers were dismissed for legally insufficient evidence. Police officers have repeatedly told New York City news investigations that their supervisors pressure them into reaching "performance goals" or quotas, resulting in the violation of innocent New

---

[3] See New York Civil Liberties Union "Stop and Frisk Report" available at http://www.nyclu.org/issues/racial-justice/stop-and-frisk-practices last visited on June 25, 2013.

Yorker's civil rights.[4]

74. The Civilian Complaint Review Board ("the CCRB"), a City police oversight agency, often finds complainants lack credibility based in part on the fact that such complainants have also brought lawsuits to remedy the wrongs they have experienced, a practice that often results in not substantiating the most serious charges brought to the CCRB. In addition, the CCRB virtually never initiates their own findings of false statements against officers who have made false statements to the CCRB in their own defense, nor do they initiate findings that officers have failed to report their fellow officers' misconduct; thus, officers have no real incentive to come forward, or to testify truthfully at the CCRB. The CCRB has no enforcement mechanisms once making a finding against an officer; it can only make recommendations to the NYPD, once finding misconduct by an officer.

75. The NYPD, once receiving a substantiated complaint by the CCRB, fails to adequately discipline officers for misconduct. In 2002, the percentage of officers who were the subject of substantiated CCRB complaints who received no discipline was 47%; in 2007, it was 75%.[5] The NYPD Department Advocate, which is endowed with the responsibility of following up on substantiated CCRB charges, is understaffed and under-utilized. Furthermore, in the extraordinarily rare event that the CCRB substantiates a complaint and the Department Advocate proves the case in an internal trial against an officer, the police commissioner still maintains the power to reduce the discipline against such an officer, which the police commissioner has done on many occasions. This entire procedure provide so many opportunities for meritorious complaints of false arrests to be dismissed or disregarded that there is no credible, effective

---

[4] See WABC's Jim Hoffer's three installments (March 3, May 23 and May 25, 2010) on NYPD quotas available at http://abclocal.go.com/wabc/story?section=news/investigators&id=7461355 last visited on June 25, 2013.

[5] The NYCLU issued a report in September 2007 on the CCRB detailing the failure of the NYPD to follow up on substantiated CCRB complaints, among other failures by the City and the CCRB to address police misconduct: "Mission Failure: Civilian Review of Policing in New York City, 1994-2006", available at: http://www.nyclu.org/files/ccrb_failing_report_090507.pdf, last visited on June 25, 2013.

oversight of police department employees, despite an apparently elaborate set of oversight mechanisms.

76. Further, the City has no procedure to notify individual officers or their supervisors of unfavorable judicial review of their conduct or to calculate the total liability of an individual officer or of a precinct.  Without this notification, improper search and seizure practices and incredible testimony go uncorrected, problematic supervision or leadership at the precinct level goes ignored, and repeated misconduct by individual officers goes unaccounted for.  Even occasional judicial findings that officers have testified incredibly are not reported routinely to the police department or any oversight agencies.

77. All of the aforementioned has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal.  "Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration-through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department-there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged." See Colon v. City of New York, et al, 2009 WL 4263362 (E.D.N.Y.)(Weinstein, J.).

78. The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights.  Despite such notice, the City has failed to take corrective action.  This failure and these policies caused the officers in the present case to violate plaintiffs' civil rights,

without fear of reprisal.

79. Plaintiff has been damaged as a result of the deliberate indifference of the Defendant City.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, as follows:

A. In favor of plaintiff in an amount to be determined by a jury for each of plaintiff's causes of action;

B. Awarding plaintiff punitive damages in an amount to be determined by a jury;

C. Awarding plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

D. Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 14, 2015
Brooklyn, New York

Respectfully yours,

By: Nicholas Mindicino, Esq.
Stoll, Glickman & Bellina, LLP
Attorneys for Plaintiff
475 Atlantic Avenue, 3rd Floor
Brooklyn, NY 11217
(718) 852-3710
(718) 852-3586
NMindicino@stollglickman.com

TO: City of New York
Corporation Counsel Office
100 Church Street
New York, NY 10007

Detective Gregory Jean-Baptiste,
Shield No. 6454

Sergeant Edward Babington